UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARICO J. JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-CV-72-JEM |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 73 of the Federal

Rules of Civil Procedure, and the consent of the parties [Doc. 13].  Now before the Court are

Plaintiff's Motion for Summary Judgment [Doc. 19] and Defendant's Motion for Summary

Judgment [Doc. 22].[2]  Marico J. Jenkins ("Plaintiff") seeks judicial review of the decision of the

Administrative Law Judge ("the ALJ"), the final decision of Defendant Kilolo Kijakazi ("the

Commissioner").  For the reasons that follow, the Court will **DENY** Plaintiff's motion and

**GRANT** the Commissioner's motion.

## I.      PROCEDURAL HISTORY

On November 27, 2015, the Commissioner found that Plaintiff was disabled as of January

22, 2013 [Tr. 61].  On March 20, 2019, the Commissioner sent Plaintiff a Notice of Disability

Cessation in which the Commissioner relayed to Plaintiff that it had been determined that he was

---

[1]      Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration
("the SSA") on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.  *See* 42 U.S.C.
§ 405(g).

[2]      Plaintiff filed a response to Defendant's Motion for Summary Judgment as well [Doc. 24].

no longer disabled as of March 2019 [*Id.* at 178]. Plaintiff then filed a Request for Reconsideration of the Commissioner's decision [*Id.* at 180]. Plaintiff had a hearing before a state agency disability hearing officer on September 11, 2019 [*Id.* at 183]. Following the hearing, the hearing officer upheld the initial determination that Plaintiff was no longer disabled as of March 20, 2019 [*Id.* at 183–207].

Plaintiff made a written request for reconsideration by an Administrative Law Judge ("ALJ") [*Id.* at 208]. On June 25, 2020, Plaintiff had a telephonic hearing before an ALJ, during which Plaintiff appeared without counsel [*Id.* at 140–60]. On August 24, 2020, the ALJ upheld the initial determination that Plaintiff was no longer disabled as of March 2019 [*Id.* at 58–70]. Following the ALJ's denial, Plaintiff informed the Commissioner that he had obtained counsel [*Id.* at 15–23]. The Appeals Council then denied Plaintiff's request for review on April 22, 2021 [*Id.* at 8]. On January 26, 2022, the Appeals Council set aside its earlier action in order to consider additional information, including a "Request for Review filed by Claimant September 25, 2022," as well as a "Request to Vacate filed by Representative May 4, 2021" [*Id.* at 2, 5]. After setting aside its earlier decision, the Appeals Council again denied Plaintiff's request for review [*Id.* at 1–4], making the ALJ's decision the final decision of the Commissioner.

Having exhausted his administrative remedies, Plaintiff filed a Complaint with this Court on February 23, 2022, seeking judicial review of the Commissioner's final decision under Section 405(g) of the Social Security Act [Doc. 1]. The parties have filed competing dispositive motions and supporting memoranda, and this matter is now ripe for adjudication.

## II.    ANALYSIS

Plaintiff raises two arguments on appeal. First, he argues he did not make an informed choice to waive his right to counsel during his administrative hearing before the ALJ [Doc. 20 p.

2

2].  Second, he argues the ALJ failed to fulfill his duty of providing a full and fair hearing and otherwise developing the record [*Id.* at 5].  Based on these alleged errors, Plaintiff requests that this Court vacate the Commissioner's final decision and remand this matter for further administrative proceedings [*Id.* at 8].

After reviewing the parties' arguments, the Court finds that Plaintiff made an informed choice to waive his right to counsel during the administrative hearing.  The Court further finds that the ALJ fulfilled his duty to fully and fairly develop the record and, to the extent he did not meet that duty, any such error did not impact the outcome of Plaintiff's case.  Accordingly, the Court denies Plaintiff's request to remand the Commissioner's final decision.

### A.  Whether Plaintiff Made an Informed Choice to Waive his Right to Counsel

Plaintiff acknowledges that, "when a plaintiff is notified of her right to counsel in writing prior to the administrative hearing, and the ALJ [] clarifies waiver of that right before proceeding with the hearing, the ALJ has satisfied her duty in advising a plaintiff of her right to representation" [Doc. 20 p. 2 (quoting *Atwood v. Comm'r of Soc. Sec.*, No. 1:13:CV-703, 2014 WL 1794580, at *4 (N.D. Ohio May 6, 2014))].  *See also Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 874, 856 (6th Cir. 1986).  He also concedes that, "[u]ndoubtedly, [he] was advised of the right of representation both before and at the beginning of the hearing" [*Id.*].[3]

Plaintiff nevertheless contends the ALJ erred by not properly inquiring into or explaining his determination that Plaintiff was capable of making an informed choice and that Plaintiff did not make a knowing and intelligent waiver of his right to counsel during the hearing [Doc. 20 pp.

---

[3]      The record reflects that Plaintiff received both a proper pre-hearing advisement [Tr. 226], and—as shown in detail below—an advisement from the ALJ during the beginning of the hearing [*Id.* at 145–46].

2, 8; *see also* Doc. 24 p. 2 ("The ALJ should have determined that Plaintiff was not able to make an informed choice to waive his right to representation.")]. Specifically, Plaintiff asserts that the ALJ did not comply with section I-2-1-80(B)(i) of the Hearings, Appeals, and Litigation Law Manual ("HALLEX") [*Id.*].[4] That section provides:

> An ALJ must ensure that the claimant is aware of his or her options for representation. Specifically, an ALJ will explain the availability of both free legal services and contingency representation, and discuss access to organizations that assist individuals in obtaining representation. An ALJ will answer any questions the claimant may have, including explaining the claimant's options regarding representation, as outlined in the acknowledgement letter. However, the ALJ will answer any questions in a manner that neither encourages nor discourages representation.
>
> If the claimant decides to waive the right to representation, the ALJ must determine whether the claimant is capable of making an informed choice to waive the right to representation. If the ALJ is satisfied that the claimant can make an informed decision, the ALJ must secure from the claimant a verbal waiver on-the-record or a written waiver, which will be marked as an exhibit. For a sample waiver of representation, see HALLEX I-2-6-98. If the claimant requests to postpone the hearing to obtain a representative, the ALJ must consider the totality of circumstances and decide on-the-record whether to grant the claimant's request for postponement.

HALLEX § I-2-1-80(B)(1).

The ALJ's initial advisement to Plaintiff was as follows:

> ALJ: Now I note that you're not represented by an attorney, or another qualified individual and I have to go over your rights to representation. . . .

---

[4] HALLEX provisions provide "procedural guidance to the staff and adjudicators" of the Social Security Administration. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008). "[W]hile the HALLEX procedures are binding on the Social Security Administration, they are not binding on courts reviewing the administration's proceedings." *Scarborough v. Astrue*, No. 3:11-CV-286, 2012 WL 6838942, at *5 (E.D. Tenn. Dec. 3, 2012) (quoting *Dukes v. Comm'r of Soc. Sec.*, No. 1:10-cv-436, 2011 WL 4374557, at *9 (S.D. Mich. Sept. 19, 2011)); *see also Bowie*, 539 F.3d at 399 (stating HALLEX provisions are "not binding on this court"); *Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18CV1233, 2019 WL 4736267, at *9 (N.D. Ohio Sept. 27, 2019) (collecting cases for proposition that "HALLEX is an agency procedural manual that is not binding on the courts").

I want to make sure that you understand that you have a right to be represented by an attorney or non-attorney who may help you obtain and submit records, explain [INAUDIBLE], make requests, protect your rights [INAUDIBLE] evidence in a light most favorable to your case. A representative may charge you for expenses such as obtaining and copying medical records, but may not charge or receive a fee unless I approve it. And they don't normally get paid unless I award benefits and then they may only accept 25% of the back benefits, or $6,000, whichever is less. Some legal organizations offer free legal representation if you qualify under their rules, but it's usually based on need. In other words, you don't have the money to pay for a lawyer. Of course, you may also choose to proceed today without a representative. So, do you understand, Mr. Jenkins, your rights to representation?

Plaintiff: Yeah.

ALJ: Okay. . . . do you wish to proceed [INAUDIBLE] representation, or would you like to request a postponement to see if you could get a representative or a lawyer?

Plaintiff: I don't have no money for no lawyer.

ALJ: Does that mean that you'd like to go forward today, or would you like to postpone in order to see if you could find a free lawyer or someone to represent you?

Plaintiff: Go forward.

ALJ: Go forward, is that what you said?

Plaintiff: Yes.

ALJ: Okay. All right.

[Tr. 145–46].[5]

Plaintiff asserts his statement, "I don't have no money for no lawyer," evinced his confusion since he did not understand the different options available to him in obtaining

---

[5]    Prior to the ALJ advising Plaintiff of his right to representation, Plaintiff was responsive to the ALJ's questions and instructions [Tr. 142–45 (providing his name, address, social security number, and telephone, abiding by the ALJ's instructions that his mother needed to leave the room, and clarifying that he was not recording the proceedings)].

5

representation [Doc. 20 p. 4]. But prior to this statement, Plaintiff confirmed that he understood his rights to representation. And to the extent Plaintiff's statement that he had "no money for no lawyer" shows some possible confusion about the options available to him, the ALJ immediately rephrased the question and asked if Plaintiff wanted to postpone "in order to see if you could find a free lawyer or someone to represent you." Plaintiff twice unequivocally responded that he wished to move forward.

Yet, Plaintiff further argues it was this exchange, "coupled with [his] established learning disabilities" and Plaintiff's testimony at the hearing, that should have alerted the ALJ that Plaintiff was incapable of making an informed choice to waive his right to representation [*Id.*]. Plaintiff points to evidence in the record that he has been diagnosed with a learning disorder and borderline intellectual functioning, that he was previously assessed an IQ score of 68, and that Dr. Derek Hopko, a licensed clinical psychologist, concluded as part of his psychological evaluation that Plaintiff "showed poor use of his basic vocabulary [and] . . . poor capacity for abstract thinking and understanding" [*Id.* at 3]. In concluding Plaintiff falls into the borderline range of intellectual functioning, however, Dr. Hopko also found Plaintiff's "thought processes included seemingly clear and logical thinking," he "was able to follow basic instructions, both written and spoken," and he was "an adequate historian" [Tr. 385–87].

Plaintiff points to his testimony during the hearing, including a portion of the following exchange between himself and the ALJ:

> ALJ: All right. Can you make change for a dollar?
>
> Plaintiff: Yeah.
>
> ALJ: Okay. So, if somebody handed you—if you—when you go to the store, for example, if you went to the local convenience store to buy a soda

6

> or something and you handed—or a coke, and you handed them money, you
> could count the change and make sure they gave you the right change back?
>
> Plaintiff:  Yeah.  Most of the time my momma go to the store and stuff for
> me.
>
> ALJ:  All right.  And is that because you just don't want to go out or it's
> because you can't handle the transaction of handing them the money?
>
> Plaintiff.  Yeah, it's like I don't going out.

[Tr. 153–54].  Plaintiff argues that this line of questioning "should have raised reasonable suspicion as to whether [his] learning disabilities impacted his ability to knowingly and intelligently waive [his] right to counsel" because "[he] did not understand the question" [Doc. 20 p. 4].  It is not clear, however, how Plaintiff affirmatively answering the ALJ's question and then providing extraneous information shows he did not understand the question, particularly when Plaintiff was otherwise able to provide clear and concise answers regarding the same topic immediately prior to, and after, this statement.

Plaintiff also argues "the ALJ asked the Plaintiff whether or not he has any objections to the record 3 times before Plaintiff was able to directly answer the questions" [Doc. 20 p. 4 (citing Tr. 147, 149)].  The Court has reviewed the cited portions of the transcript and does not find that Plaintiff was unable to answer the ALJ's questions about objections to the record.  The first time the ALJ asked Plaintiff about objections to the record, the ALJ explained that the Plaintiff could have an opportunity to review exhibits to the hearing, and Plaintiff stated that the ALJ could "[g]o ahead and proceed" [*Id.* at 147].  Later, the ALJ asked Plaintiff if he had any objections and Plaintiff responded, "Is there what?" [Tr. 148–49].  The ALJ immediately followed up by asking again whether Plaintiff had any objection to the admission of evidence and provided examples of documents in the record, and Plaintiff stated, "No" [*Id.* at 149].  The Court also notes that shortly after this exchange, Plaintiff asked the ALJ to repeat himself because "[t]he phone cut out on

7

[him]" [*Id.* at 148–49].

Plaintiff acknowledges that "there are no particular requirements regarding the questions the ALJ has to ask, or findings the ALJ must articulate" [Doc. 24 p. 2]. Based upon its review of the record, the Court finds the ALJ complied with HALLEX section I-2-1-80(B)(1) and that Plaintiff has failed to show that his desire to proceed with the hearing without an attorney was not knowingly or intelligently provided.[6] The Court therefore denies Plaintiff's first ground for remand.

## B. Whether the ALJ Fully Developed the Record

Plaintiff argues the Commissioner's decision should be remanded because the ALJ failed to fulfill his heightened duty of providing a full and fair hearing and otherwise developing the record as required when a plaintiff is proceeding without representation [Doc. 20 pp. 5–8]. The Commissioner responds that "the ALJ's actions during and after the hearing reflect that he was mindful of, and appropriately executed, his special duty to develop the record in this case" [Doc. 23 p. 17], and contrary to Plaintiff's argument, he was not prejudiced when considering "the other

---

[6]     Because the Court finds the ALJ complied with HALLEX section I-2-1-80(B)(1), the Court need not consider whether the ALJ's actions prejudiced Plaintiff. Although the Sixth Circuit has not squarely addressed the issue, lower courts within the circuit have found that an ALJ's failure to follow a provision of HALLEX is reversible error only if such non-compliance prejudiced the claimant. *See Creech v. Comm'r of Soc. Sec.*, 581 F. App'x 519, 521 (6th Cir. 2014) ("[E]ven district courts that have granted relief for failure to comply with HALLEX have required that the plaintiff demonstrate prejudice from the failure to follow the procedures." (citation omitted)); *Juszkowski v. Berryhill*, No. 18-14023, 2019 WL 7998876, at *6 (E.D. Mich. Nov. 30, 2019) (citation omitted), *aff'd sub. nom.*, *Juszkowski v. Soc. Sec. Comm'r*, No. 18-14023, 2020 WL 467851 (E.D. Mich. Jan. 29, 2020); *Scarborough*, 2012 WL 6838942, at *5 (citing cases that find a HALLEX violation constitutes reversible error only when the plaintiff was prejudiced by the ALJ's non-compliance).

8

important evidence that informed the ALJ's decision" [*Id.* at 12]. For the reasons discussed below, the Court finds the ALJ fulfilled his heightened duty and, even if he did not, any such error would not have altered the outcome of Plaintiff's case.

### 1. Applicable Law

"It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). To this end, an ALJ is responsible for "ensuring that every claimant receives full and fair hearing[.]" *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). This responsibility is balanced with the fact that "[p]romoting the claimant's case . . . is not the ALJ's obligation," as they are "a neutral factfinder, not an advocate." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (citing *Apfel*, 530 U.S. at 110–11). "So while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant." *Id.* (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986) (citing 20 C.F.R. § 404.1512(a)).

In some circumstances, "an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051–52). This heightened duty arises if "a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures." *Id.* It is not enough that "a claimant is unsophisticated and appears without counsel." *Moats*, 42 F.4th at 564. The claimant must also be incapable of presenting an effective case, which only occurs in "extreme" or "acute" cases, such as when the claimant has limited education, is "inarticulate" and "easily confused," has "impaired [] memory," and otherwise has limited "ability to read." *Id.*

9

If the ALJ does have a heightened duty, then he must "develop *fully* the record" and he "must be 'especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.'" *Lashley*, 708 F.2d at 1052 (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 405, 408 (2d Cir. 1972)). The ALJ "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and "scrutinize the record with care." *Id*. "Failure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a failure to obtain all available medical records and documentation." *Vaca v. Comm'r of Soc. Sec.*, No. 1:08-cv-653, 2010 WL 821656, at *6 (W.D. Mich. Mar. 4, 2010). But "[t]here is no bright line test for determining when the [ALJ] has . . . failed to fully develop the record. The determination in each case must be made on a case by case basis." *Lashley*, 708 F.2d at 1052

In making this case-by-case determination, the Sixth Circuit also considers whether, even if the ALJ failed to fully develop the record, the additional information the ALJ should have obtained could have impacted the outcome of the ALJ's decision. In *Lashley*, for example, the Sixth Circuit remanded the ALJ's decision for further proceedings after finding that the information the ALJ failed to inquire about "would have greatly enhanced any determination concerning the claimant's ability to perform work." *Lashley*, 708 F.2d at 1053. In contrast, in *Forrest v. Commissioner of Social Security*, the Sixth Circuit found that "[w]hatever the merits of the ALJ's refusal to let [the plaintiff] discuss his [] symptoms," remand was not required because the court could not "see how [the plaintiff's] testimony about those symptoms would have altered the outcome." 591 F. App'x 359, 363 (6th Cir. 2014). In making this determination, the court in *Forrest* relied on: (1) the fact that other portions of the record contained statements by Plaintiff about his symptoms and the ALJ relied on such records in his decision, as well as (2) the fact that,

10

"in general, the ALJ found [the plaintiff's] claims . . . not credible and inconsistent with objective evidence." *Id.* (citing 20 C.F.R. § 404.1529(a)); *see also Born v. Sec'y of Health & Hum. Servs.*, 923 F.2d 1168, 1172 (6th Cir. 1990) ("Even if the ALJ had questioned claimant in greater detail concerning his ability to sit or stand, claimant's subjective complaints of pain must be supported by objective evidence."); *Duncan*, 801 F.2d at 856 ("Duncan has not suggested, and we are unable to determine, what possible further information could have been brought forth at the hearing which would have enhanced a determination of disability." (citing *Lashley*, 708 F.2d at 1053)).

### 2. Analysis

After reviewing the parties' arguments, the records submitted by the Commissioner, and the applicable case law, the Court finds that the ALJ had a heightened duty to provide a full and fair hearing and otherwise fully develop the record. In addition, the Court finds that the ALJ fulfilled his duty to fully and fairly develop the record and, to the extent he did not meet that duty, any such error did not impact the outcome of Plaintiff's case.

### a. Heightened Duty

The Commissioner appears to acknowledge [Doc. 23 p. 17], and the Court finds, that the ALJ had a heightened duty to provide a full and fair hearing and otherwise fully develop the record because Plaintiff was "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with the hearing procedures." *Wilson*, 280 F. App'x at 459. Plaintiff represented himself at the hearing [Tr. 145–46]. He was unfamiliar with both the hearing procedures and facts of his case, as he stated during the hearing that he had been unable to access the record that the ALJ had provided him a copy of because he did not have access to a computer [*Id.* at 147]. *See Moats*, 42 F.4th at 564 (finding no heightened duty, in part, because the plaintiff had prepared for the hearing by reviewing and supplementing his case file therefore indicating that he understood

11

his evidentiary burden). In addition, Plaintiff was incapable of presenting an effective case to the extent he had limited ability to read, impaired memory, and suffers from borderline intellectual functioning [Tr. 65–66]. *See Thrasher v. Comm'r of Soc. Sec.*, No. 1:12-cv-151, 2013 WL 486123, at *5 (S.D. Ohio Feb. 6, 2013) ("[P]laintiff suffers from severe mental impairments, and . . . is of borderline intellectual functioning based on his test scores. The ALJ's duty to ensure the record was fully and fairly developed was further heightened given these circumstances.").

### b. Development of the Record

Relying primarily on *Lashley*, Plaintiff argues that the ALJ failed to provide a full and fair hearing or otherwise fully and fairly develop the administrative record as required by his heightened duty [Doc. 20 pp. 5–8]. More specifically, Plaintiff argues the ALJ engaged in only "superficial" questioning of Plaintiff regarding four subjects: why Plaintiff had been unable to keep up with work tasks at his most-recent employment, Plaintiff's ability to care for himself, the extent of Plaintiff's medication side effects, and why Plaintiff failed to attend treatment appointments [*Id.* at 6–7]. Plaintiff argues the superficial questioning, along with the short duration of the hearing—which lasted twenty-eight minutes and contains only seven pages of transcript of Plaintiff's testimony—shows that the ALJ failed to provide a full and fair hearing [*Id.* at 5–7]. Plaintiff also challenges the ALJ's failure to order updated IQ testing for Plaintiff following the hearing [*Id.* at 7–8].

In response, the Commissioner argues the ALJ met his heightened duty in questioning Plaintiff on these four subjects and was otherwise not required to obtain additional IQ testing [Doc. 23 pp. 12–17]. Along with responding to Plaintiff's arguments, the Commissioner also argues that the ALJ fulfilled his heightened duty because (1) "the Commissioner obtained a consultative examination with Dr. Hopko, which provided important evidence supporting the ALJ's decision";

12

(2) "during the hearing, the ALJ questioned Plaintiff regarding whether he had any further treatment since 2019," Plaintiff stated he had, and then the ALJ "obtained the relevant records and reviewed them as part of his analysis"; and (3) Plaintiff "does not argue that any of his treatment records remain extant" despite now being represented by counsel [Doc. 23 pp. 13–14].

While the Court will address each of Plaintiff's arguments, in turn, the Court first notes the steps the ALJ took during, and after, the hearing to develop the record. One of the first things the ALJ did in questioning Plaintiff was to inquire into any additional outstanding records [Tr. 147–48]. The ALJ then obtained those records, including Plaintiff's treatment records from Helen Ross McNabb from February 8, 2017, to April 29, 2020, as well as Plaintiff's treatment records from the Knox County Health Department for November 15, 2019, to July 1, 2020 [*Id.* at 61; 421–65]. In that way, Plaintiff's case is distinguishable from those instances in which courts have remanded an ALJ's decision because the ALJ stated they would obtain relevant records then failed to do so. *See, e.g.*, *Strang v. Comm'r of Soc. Sec.*, 611 F. App'x 271, 275 (6th Cir. 2015) ("Remand is warranted in this matter because, by telling [the plaintiff] she would procure certain documents for the record and then failing to follow through, the ALJ effectively deprived [the plaintiff] of a full and fair hearing."). Plaintiff's case is also distinguishable from those cases in which the ALJ failed to consider then-existing objective medical evidence that the ALJ knew, or should have known, about. *See, e.g.*, *Sarp v. Comm'r of Soc. Sec.*, No. 16-10099, 2017 WL 8896206, at *7 (E.D. Mich. Aug. 18, 2017) (remanding the plaintiff's claim when the plaintiff referenced being examined by a psychiatrist at the hearing but the ALJ failed to inquire about any resulting psychiatric examination report and the report would have been "significant, if not critical").

13

***Plaintiff's prior work experience.*** Plaintiff argues the ALJ provided only "superficial questioning" of Plaintiff's prior work experience. Plaintiff testified that he was terminated from his last job because he could not keep up with the work:

> ALJ: . . . . So, tell me why it is that you can't work on a—you know, do work at all like an eight-hour day, 40 hours a week. What is it that's keeping you from having a job?
>
> Plaintiff: It's like it's hard for me t —like I feel really like, I don't know, like irritated and just real just uncomfortable because being a lot around people and like I get like maybe a task or something. Like my mind be racing and it be hard for me to keep up. . . . Like the last job that I had, that's—they let me go because I couldn't keep up with the work.
>
> ALJ: Okay. All right.

[Tr. 153; *see also* Doc. 20 p. 6].

Plaintiff argues the ALJ failed to fulfill his duty by "not ask[ing] why the Plaintiff could not keep up with work tasks" [Doc. 20 p. 6]. As the Commissioner points out, however, the ALJ did elicit "a reasonable explanation for why he could not work—[Plaintiff] explained he was irritated and uncomfortable around other people, that his mind raced, and it was hard for him to keep up" [Doc. 23 p. 15]. That Plaintiff provided a reasonable explanation for why he was unable to perform his prior work distinguishes this case from *Lashley*, where the Sixth Circuit relied heavily on the fact that the ALJ "did not obtain an explanation why plaintiff was forced to leave [his] job after only 3 days." *Lashley*, 708 F.2d at 1053 (finding this fact to be "[m]ost important[]").

Moreover, additional questioning would not have altered the outcome of the ALJ's decision. Plaintiff's testimony was consistent with his prior testimony to the disability hearing officer, including his statements, "I have lost a job because I could not keep up with the pace. It

14

was a factory job. I was not keeping up at Little Caesar's [either]" [Tr. 199]. It was also consistent with his statements to Dr. Hopko. Specifically, Dr. Hopko stated in his report,

> [Plaintiff] states that his most recent job was working in a temp service position arranging fabrics about five years ago. He reported being employed for about two months and states, "I was let go because of missing out with counts." He also states that he worked at Little Caesar's for about four months and was fired, "because I left and went somewhere when I was on the clock."

[Tr. 386]. The ALJ, appears to have relied on these other statements by Plaintiff when formulating Plaintiff's RFC because the ALJ restricted Plaintiff from performing "fast-paced assembly line or strictly-monitored daily production quota" jobs—tasks that would otherwise be consistent with his former factory job and "missing out with counts" [Tr. 65]. That there were additional statements in the record from Plaintiff regarding why he was unable to keep his prior employment and the ALJ considered these statements in making his determination indicates that additional testimony from Plaintiff during the hearing on why he was unable to keep up with his past work would not have altered the ALJ's decision.

**Plaintiff's ability to care for himself.** Plaintiff argues "[t]he ALJ did not probe into [his] simplistic answers to determine what type of issues Plaintiff has taking care of himself and how often these issues present themselves" [Doc. 20 p. 7]. In support of his argument, Plaintiff relies on the following testimony from the hearing:

> ALJ: All right. Do you have any trouble taking care of yourself other than, you know, being reminded to take your meds, pick up your clothes? I mean do you have any issues where you won't bathe without someone reminding you?
>
> Plaintiff: Yeah.

[Tr. 154].

15

But this exchange was not the only portion of Plaintiff's testimony regarding his ability to care for himself. Prior to this point of Plaintiff's testimony, the ALJ asked Plaintiff if his mother reminded him to take his medications, and he responded, "Yeah" [Tr. 152]. In addition, immediately before the portion of the testimony cited by Plaintiff in support of his argument, the following dialogue occurred:

> ALJ: . . . . So, what's your—what do you do on a daily basis? What's your typical day look like?
>
> Plaintiff: Yeah, it's get up, watching stuff on just like TV, and them things, and just like just eat. It really would be—would be really just be chilling in my room and watching stuff.
>
> ALJ: And do you help your mom around the house at all?
>
> Plaintiff: She like—not really help. She's doing like a lot, and I'll wash my clothes. We be remodeling. I can pick up stuff—
>
> ALJ: Okay.
>
> Plaintiff: —if we have some company. I try to help.

[Tr. 154].[7]

The ALJ cited all of this testimony in his decision [Tr. 65]. Thus, while the ALJ may not have probed further into Plaintiff's answer regarding whether he was able to bathe himself without a reminder, the ALJ did inquire into Plaintiff's ability to care for himself on a daily basis in other areas.

But even if the ALJ had probed further into "what type of issues Plaintiff has taking care of himself and how often these issues present themselves," as Plaintiff argues the ALJ was required to do, it would not have altered the outcome of the ALJ's decision. For one, the record contains

---

[7]     Immediately after asking Plaintiff if he has any issues bathing himself without a reminder, the ALJ also asked "is there anything else that you think I should know before we start talking to [the vocational expert]" [Tr. 155].

other statements by Plaintiff regarding his activities of daily life that the ALJ considered in his decision. Specifically, Dr. Hopko stated as follows in the "Activities of Daily Living and Current Functioning" section of his report:

> [Plaintiff] states that he can prepare simple meals (i.e., sandwich, cereal, microwave dinners). He states that he can cook chicken in the oven. He states that he can wash dishes, vacuum, and sweep. He states that his mother does his laundry and that he has the skills to be able to do laundry. He states that he can cut grass with a push mower. He states that he has never had a driver's license. He states that he failed the written learner's permit examination six times. He reports that his mother drove him to the interview. He states that for hobbies he likes to "play video games . . . listen to music . . . go to the park . . . spend time with my daughter . . . watch anime and stuff." He states that his main social support is his mother.

[Tr. 387]. The ALJ cited extensively to Dr. Hopko's report in his decision, including as it relates to Plaintiff's ability to perform daily tasks [Tr. 67].

Furthermore, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained in this decision" and, as such, "these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence" [Tr. 66]. Here, the objective medical and other evidence in the record—evidence the ALJ cited in his decision—contradicts any finding that Plaintiff's symptoms caused greater limitations in his day-to-day activities. Specifically, the ALJ cited to Plaintiff's January 2020 treatment notes stating he was "appropriately dressed" [Tr. 67]. The ALJ also cited to Plaintiff's mother's statements in the record regarding his ability to care for himself to find:

> As to activities of daily living, the claimant has described daily activities, which are not consistent with the complaints of disabling symptoms and limitations. He testified that he could help around the house and do his own laundry. His mother reported that he plays games and listens to music. He

17

> helps care for his daughter. His mother said he has no problem with personal care but needs reminders for grooming and medications. He is able to prepare simple meals but he does not like to do chores. He goes outside and walks or rides in a car. His mother also noted that he rides a "ripstick" for transportation. She indicated he could not pass a driver's test but he shops by mail and computer and in stores with help. She said he could pay bills and count change with assistance.

[*Id.* at 67]. Thus, even if the ALJ had probed further into Plaintiff's ability to care for himself, and even if Plaintiff testified to greater limitations than those included in the ALJ's RFC determination, Plaintiff has failed to show how the outcome of his case would have been different since the remainder of the record—including both his own prior statements and the other evidence in the record—contradicts any greater limitations.

*Plaintiff's side effects from his medications.* Plaintiff also challenges the ALJ's questioning of the side effects from his medication [Doc. 20 p. 7]. Plaintiff and the ALJ had an exchange regarding any side effects of Plaintiff's medication:

> ALJ: Okay. And what kind of medicines are you taking now?
>
> Plaintiff: They in my room. I don't know the name of them exactly.
>
> ALJ: Okay. Are you having any serious side effects from them?
>
> Plaintiff: [Inaudible]. It like be ups and down.
>
> ALJ: Okay.
>
> Plaintiff: And sometimes be feeling good and then it be feeling bad.

[Tr. 152].

Plaintiff argues the ALJ only "superficially inquired into [his] side effects from medications, which is problematic because "the ALJ stated that Plaintiff has no established medical side effects [that] would interfere with the jobs identified by the vocational expert" [Doc. 20 p. 7].

18

But any additional questioning would not have altered the outcome. As explained above, the ALJ found that he would accept the claimant's statements regarding the intensity, persistence, and limiting effects of his systems only to the extent they were consistent with the objective medical and other evidence [Tr. 66]. And as the Commissioner points out, "the ALJ cited McNabb Center records from 2020[,] which reasonably support the conclusion that Plaintiff did not experience side effects from his medications" [Doc. 23 p. 15]. Any additional testimony Plaintiff may have offered regarding the side effects of his medications had the ALJ inquired further, therefore, would not have altered the ALJ's decision. It would have contradicted the medical evidence the ALJ relied on his decision, including the June 24, 2016, February 13, 2020, and April 29, 2020 reports from the Knox County Adult Clinic that noted that Plaintiff had denied any side effects [Tr. 67 (citing *id.* at 357, 424, 427)].

***Plaintiff's failure to continue treatment.*** Plaintiff argues that the ALJ failed to ask why Plaintiff had stopped attending treatment in 2016 despite citing in his decision that Plaintiff was not involved in mental health treatment from June 2016 to January 2020 and was discharged in February 2017 for failure to keep appointments [Doc. 20 p. 7]. Plaintiff argues his "lack of treatment and failure to attend appointments [could have] resulted from an inability to afford treatment, a lack of transportation, or from the symptoms caused by his mental impairments" [*Id.*].

The Court finds that Plaintiff has failed to establish how the outcome of his case would have been different had the ALJ inquired into the reason Plaintiff ceased treatment in 2016. For one, Plaintiff only speculates about what he might have said had the ALJ inquired into why he ceased treatment. *See Brown v. Comm'r of Soc. Sec.*, No. 12-CV-15108, 2013 WL 5785783, at *8 (E.D. Mich. Oct. 28, 2013) ("To establish prejudice, the claimant must point to specific facts that the ALJ did not consider and show that those facts would have been relevant to the ALJ's

19

determination. Mere conjecture is insufficient." (internal quotations and citations omitted)). And, even if Plaintiff had represented to the Court that he would have told the ALJ he was unable to continue treatment in 2016 because of the severity of his impairments—or the other reasons he offers on appeal—once again, the ALJ would have relied on such testimony only to the extent it aligned with the other evidence in the record [Tr. 66].

The other evidence in the record would have contradicted any testimony that Plaintiff continued to need treatment in 2016 despite failing to attend. As the ALJ stated in his decision in reference to Dr. Hopko's opinion, which the ALJ relied upon heavily and found persuasive, "[t]he claimant was not taking medication when evaluated in March 2019. Still, on consultative evaluation [Dr. Hopko], did not find significant overt symptoms of ADHD and mood was noted to be only mildly depressed" [Tr. 66]. Thus, even assuming Plaintiff testified that he ceased treatment because the symptoms of his impartments were too severe, this testimony would have contradicted Dr. Hopko's finding that Plaintiff had no significant overt symptoms of ADHD and mood and only mild depression despite not being on any medication.

*Failure to order additional testing.* Plaintiff argues the ALJ failed to sufficiently develop the record by failing to order a psychological examination with testing because such an examination "would have been beneficial to supplement the gap in [Plaintiff's] treatment" and "provide[d] a better overview of Plaintiff's limitations," especially since the ALJ's decision describes a discrepancy between Plaintiff's Full Scale IQ scores at age ten and thirteen [Doc. 20 pp. 7–8]. In response, the Commissioner argues that "the Commissioner already sought Dr. Hopko's [consultative examination] opinion, which [found] that Plaintiff had borderline intellectual functioning, not intellectual disorder" [Doc. 23 p. 16 (citing Tr. 66, 387)]. The Commissioner also cites to the Program Operations Manual System, which explains that,

20

"continuing disability reviews like Plaintiff's 'usually do not require new IQ tests' because older tests, 'especially a test from age 16 or older, will remain relevant and can be used in the [continuing disability review] process.'" [*Id.* at 16–17 (citing POMS DI 28101.150)].[8]

The Court finds that the ALJ fulfilled his heightened duty to fully develop the administrative record, despite not ordering a subsequent psychological evaluation with testing. As the Commissioner notes, Plaintiff was either sixteen or seventeen in 2013 when he received his second IQ test with a resulting score of 68 [Doc. 23 p. 16 (citing Tr. 66, 161)]. According to POMS DI 28010150, "IQ scores generally tend to stabilize by age 16" and "[c]ontinuing disability reviews (CDR) for adults usually do not require new IQ tests." Often, an IQ test used in the comparison point decision (CPD), especially a test from age 16 or older, will remain relevant and can be used in the CDR process." Thus, according to the Commissioner's manual, an ALJ would not typically need to request additional IQ testing for a case like this one.

As discussed previously, this is not a case in which the ALJ failed to obtain already-existing medical evidence. Rather, Plaintiff argues the ALJ should have ordered additional testing. Plaintiff fails to cite any authority, however, that would require an ALJ—even with the heightened duty to develop the record—to order new testing when the Commissioner's own guidelines would not otherwise require such testing. Absent such authority, the Court finds the ALJ did not fail to fulfill his heightened duty.[9]

---

[8] Plaintiff does not rebut the Commissioner's argument in his reply brief [Doc. 24].

[9] Even if the ALJ had ordered additional testing, there is no indication plaintiff would have received a lower IQ score and, even if he did receive a lower score, such a finding would arguably contradict Dr. Hopko's opinion—an opinion the ALJ found persuasive—that Plaintiff fell in the borderline range of intellectual functioning.

21

***The duration of the hearing.***  Plaintiff compares his case to the plaintiff in *Lashley* to the extent the Sixth Circuit noted in that case that "the hearing was . . . a mere 25 minutes, and was fully transcribed in 11 pages" whereas, "[h]ere, Plaintiff's hearing lasted 28 minutes, [] was transcribed in 19 pages" and, "[o]f the 19 pages, 7 pages fully transcribed Plaintiff's testimony" [Doc. 20 pp. 5–6].  As Plaintiff also notes, however, the *Lashley* court directed that whether the ALJ satisfied their heightened duty must be determined on a case-by-case basis [*Id.* at 5 (citing *Lashley*, 708 F.2d at 1052)].  Thus, the length of the hearing is not dispositive.  *See Forrest*, 591 F. App'x at 363 (finding a fifteen-minute hearing sufficed especially considering the plaintiff's "negligible work experience"); *Born*, 923 F.2d at 1172 (holding that brevity of a hearing alone does not render it insufficient where failure to extensively examine the claimant does not result in unfair or unsupported conclusions).  For the reasons already explained, the Court finds that despite the length of the hearing, the ALJ fulfilled his duty to fully develop the record, and to the extent he did not, any additional development would not have altered the outcome.

For all these reasons, Plaintiff's second basis for remand is denied.

## III.    CONCLUSION

Based on the foregoing, the Court will **DENY** Plaintiff's Motion for Summary Judgment [**Doc. 19**], and **GRANT** the Commissioner's Motion for Summary Judgment [**Doc. 22**].  The Court **AFFIRMS** the decision of the Commissioner and **DIRECTS** the Clerk of Court to close the case.

ORDER ACCORDINGLY.


Jill E. McCook
United States Magistrate Judge